# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

Stutes, et al                                 Civil Action No. 6:16-cv-01253

versus                                        Judge Shelly D. Dick

Gulfport Energy Corp.                         Magistrate Judge Carol B. Whitehurst


## REPORT & RECOMMENDATION

Before the undersigned, by referral from the district judge, is (1) a Motion To Remand filed by Plaintiffs, Keith Stutes, District Attorney for the 15th Judicial District of the State of Louisiana, and the State of Louisiana ex rel. Keith Stutes ("District Attorney") [Rec. Doc. 42]; (2) a Motion To Remand filed by Intervenor-Plaintiff, the State of Louisiana, *ex rel.* Jeff Landry, Attorney General ("Attorney General") [Rec. Doc. 50]; and, (3) a Motion To Remand filed by Intervenor-Plaintiff, the State of Louisiana, through the Louisiana Department of Natural Resources, Office of Coastal Management and its Secretary, Thomas F. Harris ("DNR") [Rec. Doc. 51] (collectively referred to as "Plaintiffs"), a Memoranda in Opposition to the Plaintiff's Motions filed by Shell Offshore Inc., Shell Oil Company, and SWEPI LP ("Shell"), Exxon Mobil Corporation and Mobil Oil Exploration and Producing Southeast Inc. ("Exxon"), Union Oil Company of California ("Union Oil"), BP America Production Company ("BP"), ConocoPhillips Company ("Conoco") and the

Louisiana Land and Exploration Company LLC ("LLEC") (collectively referred to as "the Oil Companies") [Rec. Doc. 67]; a Memorandum in Opposition to the Plaintiffs' Motions filed by Apache Corporation ("Apache") and LLOG Exploration & Production Company, L.L.C. ("LLOG") [Rec. Doc. 68]; a Memorandum in Opposition to Plaintiffs' Motions filed by Tennessee Gas Pipeline Company LLC ("TGP") [Rec. Doc. 69]; Apache's Motion to adopt the Oil Companies' Memorandum [Rec. Doc. 81]; LLOG's Motion to adopt the Oil Companies' Memorandum [Rec. Doc. 82]; Mosbacher Energy Company's ("Mosbacher") Motion to adopt the Oil Companies', Apache's and TGP's Motions [Rec. Doc. 87] (Collectively referred to as "Defendants"), and Plaintiffs' Replies thereto [Rec. Docs. 97; 99; 101; 103]. Also before the Court are Plaintiffs' Supplemental Memoranda [Rec. Docs. 127; 128], Defendants' Supplemental Memoranda in opposition [Rec. Docs. 132; 133; 134] and Plaintiffs' Replies thereto [Rec. Docs. 138; 139].[1] For the reasons provided, the undersigned recommends that the Motions To Remand filed by Plaintiffs be granted.

---

[1]The Court allowed the parties to brief the Fifth Circuit's decision in *Board of Commissioners of Southeast Louisiana Flood Protection Authority-East v. Tennessee Gas Pipeline Company, L.L.C.*, 850 F.3d 714, 720 (5ᵗʰ Cir. 2017) as it applied to the issues presented in this action. *See p. 7, infra.*

## I. Background

The District Attorney filed this action on July 28, 2016, in the Fifteenth Judicial District Court, Vermilion Parish, Louisiana, against nine defendants, some of whom are not diverse in citizenship. *R. 1-2, p. 3*. Also, on that date, the District Attorney filed a First Amended And Restated Petition For Damages To The Vermilion Parish Coastal Zone naming 53 defendants. *Id at p. 35*. On August 2, 2016, the Attorney General filed an intervention in this action, *Id at p. 171,* and on August 10, 2016, the DNR intervened in the action, *Id at p. 186.*

Plaintiffs rely solely on a body of Louisiana state law called the State and Local Coastal Resources Management Act of 1978, as amended, the "CZM Act of 1978", La. R.S. 214.21, *et seq.* ("CZM Laws"), along with the state and local regulations, guidelines, ordinances, and orders promulgated thereunder. The CZM is administered by the Louisiana Department of Natural Resources ("DNR"). CZM Laws regulate certain "uses" within the Coastal Zone of Louisiana through a permitting system. *See* La. R.S. § 49:214.30. The CZM Laws prohibit anyone from engaging in a "use" without first applying for and receiving a coastal use permit. A "use" is any activity within the Coastal Zone which has a direct and significant impact on coastal waters. La. R.S. § 49:214.23(13). The CZM Laws further divide "uses" within the Coastal Zone into uses of state concern and uses of local concern. La. R.S. § 49:214.25(A).

3

The State issues permits relating to "uses of state concern" in the Coastal Zone, and local governments with "approved programs" issue permits for "uses of local concern."

In their First Amended Petition Plaintiffs generally allege that Defendants' oil and gas operations and activities associated with eleven oil and gas fields in Vermilion Parish—Freshwater Bayou, North Freshwater Bayou, Intracoastal City, Buck Point, North Buck Point, Lac Blanc, Pecan Island, North Pecan Island, South Florence, West White Lake and Tigre Lagoon— were conducted in violation of the CZM Laws and caused substantial damage to land and water bodies located in the "Coastal Zone" under the CZM Act of 1978.

*R. 1-2, ¶ 3.* More particularly Plaintiffs allege,

> Each Defendant drilled and/or operated oil and gas wells within one or more of the Operational Areas... The operations and activities of Defendants alleged in this petition to be in violation of the CZM Laws were conducted (or are being conducted) to enable or support the drilling and operation of the oil and gas wells....
>
> · · ·
>
> The use of waste pits in the Operational Area has direct and significant impact on state coastal waters located within Vermilion Parish....these waste pits and areas adjacent thereto have never been cleared, revegetated, detoxified, and/or restored to their original condition....
>
> · · ·
>
> ... Each incident involving the discharge of oil field waste, including

4

without limitation, oil field brines, has a direct and significant impact on state coastal waters located in Vermilion Parish....

. . .

In addition ... Defendants' oil and gas activities have caused the Vermilion Parish Coastal Zone, and in particular the canals, bayous, sediments, marshes, soils, and ground waters in the Operational Areas, to become contaminated or polluted in excess of applicable State standards, which has a direct and significant impact on state coastal waters....

. . .

Since 1978 and before, Defendants' oil and gas activities have resulted in the dredging of numerous canals in, through, and across the Operational Areas. The dredging of canals in the Operational Areas has a direct and significant impact on the state coastal waters within Vermilion Parish.... Defendants' dredging activities have resulted in the degradation of the Operational Areas, including the erosion of marshes and the degradation of terrestrial and aquatic life therein. Additionally, the destruction of the Vermilion Parish Coastal Zone has increased the risk of damage from storm-generated surges and other flooding damage, and has enabled and/or accelerated saltwater intrusion.... Additionally, the destruction of the Vermilion Parish Coastal Zone has increased the risk of damage from storm-generated surges and other flooding damage, and has enabled and/or accelerated saltwater intrusion. Furthermore, Defendants failed to revegetate, refill, clean, detoxify and otherwise restore these canals to their original condition....

*Id* at ¶¶ *19, 21, 23, 24, 25*.

Plaintiffs seek all damages and remedies appropriate under the CZM Laws, including but not limited to, restoration and remediation costs; actual restoration of disturbed areas to their original condition; costs necessary to clear, revegetate,

detoxify and otherwise restore the affected portions of the Vermilion Parish Coastal Zone as near as practicable to its original condition; declaratory relief; litigation costs and expenses and attorney's fees. *R. 1-2, p. 3, Petition For Damages.*

On September 2, 2016, Defendants removed the District Attorney's lawsuit under 28 U.S.C. § 1441(a), federal question jurisdiction, specifically, the general maritime law and the Outer Continental Shelf Lands Act ("OCSLA"). *R. 1.* Defendants argued that the activities challenged by Plaintiff span Vermilion Parish and include the dredging and maintenance of navigable waterways and transportation of minerals to and from the outer continental shelf. They further argued that Plaintiffs' action "could have a profound and unprecedented effect on federal energy policy and the careful federal-state balance of regulatory oversight of Louisiana's coastal zone." *Id.* Finally, Defendants argued that Plaintiffs' claims under admiralty law are removable based on the 2011 amendments to 28 U.S.C. § 1441.

In their motion to remand, Plaintiffs assert that this Court does not have subject matter jurisdiction in this case and Defendants' contentions to the contrary are unfounded. Plaintiffs argue they filed this action in state court demanding a jury and alleging only state law claims under the Louisiana Coastal Zone Management Act. Diversity jurisdiction does not exist in this case. But even if this is a general maritime action—which they strenuously assert it is not—Plaintiff argue there is no removal

jurisdiction over maritime cases brought in state court. *Barker*, 713 F.3d at 219. "[S]uch lawsuits are exempt from removal by the 'saving to suitors' clause ... and therefore may only be removed when original jurisdiction is based on another jurisdictional grant, such as diversity of citizenship." *Id* at 223.

On October 4, 2016, the Court granted the Oil Companies' Motion to Continue the Hearing on Plaintiffs' Motion to Remand until a decision was rendered by the Fifth Circuit Court of Appeals regarding the case of *Bd. Of Comm'rs of the SE Louisiana Flood Prot. Auth.-E.V. Tennessee Gas Pipeline Co., LLC,* 88 F.Supp.3d 615 (E.D.La., 2015) ("*Levee Board*"). *R. 60.* The Fifth Circuit issued the ruling on March 3, 2017, *Board of Commissioners of Southeast Louisiana Flood Protection Authority-East v. Tennessee Gas Pipeline Company, L.L.C.*, 850 F.3d 714, 720 (5th Cir. 2017), and the Court allowed the parties to file supplemental briefing regarding the applicability of the ruling. *R. 120.* On May 17, 2017, the Court conducted a hearing on all of the motions with oral argument. *R. 146.* During the hearing, the Court addressed the Fifth Circuit's decision in the *Levee Board* case and all parties agreed that the court's March 3, 2017 ruling does not control the holding in this case. Accordingly, the Court will not address the parties supplemental briefing as to the

*Levee Board* case.[2] Also in the hearing, TGP represented in open court that it wished to waive its opposition memorandum to Plaintiffs' Motion based on preemption under the Natural Gas Act. *R. 69*.

## II. Legal Standard

A defendant's right to remove is strictly statutory in nature. *See Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 366 (5th Cir.1995). The general removal statute governing civil actions provides:

> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants....

28 U.S.C.A. § 1441(a).

Pursuant to 28 U.S.C. § 1441(a), a defendant may remove a state court action to federal court only if the action could have originally been filed in federal court. *Aaron v. Nat'l Union Fire Ins. Co.*, 876 F.2d 1157, 1160 (5th Cir.1989). Thus, the propriety of removal is keyed to the original jurisdiction of the federal district courts, *Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 366 (5th Cir.1995), and consideration of a motion to remand a case removed from state court presents issues

---

[2] Plaintiffs' Supplemental Memoranda [Rec. Docs. 127; 128], Defendants' Supplemental Memoranda in opposition [Rec. Docs. 132; 133; 134] and Plaintiffs' Replies thereto [Rec. Docs. 138; 139].

of subject matter jurisdiction and statutory construction, *id*. at 365.

The burden of establishing subject matter jurisdiction in federal court rests with the party seeking to invoke it. *St. Paul Reinsur. Co. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir.1998). Consequently, in a removed case the removing defendant bears the burden of establishing that federal jurisdiction exists. *DeAguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir.1995). Because federal courts are courts of limited jurisdiction by origin and design, the presumption is that a federal court is without jurisdiction unless "the contrary appears affirmatively from the record." *Oliver v. Trunkline Gas Co.*, 789 F.2d 341, 343 (5th Cir.1986).

The statutory and constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining federal courts from acting at certain times. *Steel Co. v. Citizens for a Better Envir.*, 523 U.S. 83, 101 (1998). "Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which (a federal) statute has defined." *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 212 (1971). Because the effect of removal is to deprive the state court of an action properly before it, removal raises significant federalism concerns. *Carpenter*, 44 F.3d at 365–66. Therefore, the removal statutes must be strictly and narrowly construed. *See Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir.2002)). Any doubt regarding whether removal jurisdiction is proper

should be resolved against exercising federal jurisdiction. *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir.2000).

The well-pleaded complaint rule places even further restrictions on a defendant's ability to remove a case from state court. *Aaron*, 876 F.2d at 1160. The rule provides that the plaintiff's properly-pleaded complaint governs the jurisdictional determination and if on its face such a complaint contains no issue of federal law then there is no federal question jurisdiction. *Id.* at 1161. The court must look only to "what necessarily appears in the plaintiff's statement of his own claim." *Venable v. La. Workers' Comp. Corp.*, 740 F.3d 937, 942 (5th Cir.2013). Because the plaintiff is "master of the claim" he may plead his case to depend on state law exclusively and thereby defeat attempts at removal. *Carpenter*, 44 F.3d at 367.

### III. Analysis

Defendants allege three (3) grounds of federal jurisdiction;[3] the Oil Companies allege jurisdiction based on maritime law and on the Outer Continental Shelf Lands Act ("OCSLA"), *R. 70*, and Apache alleges "substantial federal question jurisdiction", *R. 68*. Apache adopts the Oil Companies' motion and also asserts OCSLA and maritime jurisdiction. *R. 81; 82.*

---

[3] While there were originally four grounds, TGP waved its jurisdiction argument based on preemption of the Natural Gas Act.

Plaintiffs move the Court to remand their action to the Fifteenth Judicial District Court. They allege that in a 2013 analogous matter, the Parish of Plaquemines filed twenty-one suits under the CZM, and the Parish of Jefferson filed seven such suits. All twenty-eight suits were removed to the Eastern District and eventually remanded to state court. Plaintiffs contend that "ten judges of the Eastern District rejected the identical OCSLA and maritime removal argument made here." *R. 42-1, p. 1*. They further contend that the "substantial federal question" jurisdiction argument of Apache was also rejected in the Eastern District cases in which such allegations were made. *R.42-2*.

The Court will examine the Defendants' motions related to the jurisdictional grounds for removal of Plaintiffs' law suit to this Court as follows.

### 1) Federal Maritime Jurisdiction

Defendants removed this case on the grounds of federal question jurisdiction under §§ 1331 as well as 1441(a).[4] *R 1*. Defendants assert that the 2011 amendments to the general removal statute apply to their removal. *Id.* Plaintiffs deny that the 2011 Amendments permit removal into admiralty, but argue, even if they did, the claims in this case would not removable as they are not admiralty claims. *R. 42-1, p. 15*.

---

[4] Under 28 U.S.C. § 1441(a), any state court civil action over which the federal courts would have original jurisdiction may be removed.

11

Thus, the first issue before the Court is whether maritime law "applies of its own force," based on the twin tests of location and connection with maritime activity. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).

To state a claim for a maritime tort, the plaintiff must allege facts sufficient to satisfy the "location test" and "connection test." The location test is satisfied if the tort occurred on navigable waters or if the injury occurred on land but was caused by a vessel on navigable waters. *Grubart* at 534. The tort "occurred on" navigable waters if the harm "took effect" there. *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir.1999). The connection test is satisfied if two conditions are met. *Grubart* at 534. First, "the general features of the type of incident involved" must have "a potentially disruptive impact on maritime commerce." *Id*.  The court uses "a description of the incident at an intermediate level of possible generality," *id*. at 538, that is neither too broad to distinguish among cases nor too narrow to recognize potential effects on maritime commerce, *id*. at 538–39. Second, "the general character of the activity giving rise to the incident" must show "a substantial relationship to traditional maritime activity." *Id*. at 534. The court considers "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law

that the reasons for applying special admiralty rules would apply in the suit at hand."

*Id*. at 539–40.

*1. Location test*

With respect to the location test, Defendants contend that the location test is satisfied because the Petition alleges injuries suffered on land which were purportedly caused by vessels on navigable waters. Defendants argue that Plaintiffs' lawsuit alleges some of the injuries were caused by dredging "numerous canals in, through, and across the Operational Area"[5] which "resulted in the degradation of the Operation Area" and "increased the risk of damage from storm-generated surges and other flooding damage . . ." *R. 70, p. 10.* Citing *Stewart v. Dutra Construction*, 543 U.S. 481 (2005), they assert the dredges at issue in this case qualify as "vessels" for purposes of maritime jurisdiction because they were "*capable*" of being used for transportation on water. *Id* at 489 ("dredges are vessels because they are watercraft with "the capacity to be navigated in and upon the waters").

Next, Defendants argue that Plaintiffs' allegations challenge activities on navigable waterways. They contend that the Fifth Circuit defines "navigable"

_____

[5] The Petition stated that the term "Operational Area" is used to describe the geographic extent of the area within which the complained-of operations and activities occurred. The "Operational Area" is identified on the map located in Exhibit B attached to the Petition. *R 1-2, ¶¶*

waterways broadly to include waters that are "used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted." *In re Needham*, 354 F.3d 340, 346 (5th Cir 2003). Defendants contend that  Plaintiffs' Petition supports that the alleged activities at issue involved navigable waterways and that the oil and gas wells were located in and/or connected to navigable waterways. *R. 1-2, ¶¶ 22, 25*.

Plaintiffs do not dispute that dredges are vessels, but oppose Defendants' contention that the alleged violations occurred on navigable water. They assert that in addition to dredging violations, their allegations include non-dredging statutory, regulatory and permit violations. Plaintiff further contend that  most of the oilfield related dredging at issue involved private access canals, built on privately owned land that were dredged solely for the purpose of conducting oil and gas exploration and production activities. They argue that such private canals do not satisfy the location test because they were either built on private property or on state land owned by the state in its capacity as a private person. See *Vaughn v. Vermilion corp.*, 444 U.S. 206, 207 (1979) (holding that artificial waterways canals in Vermilion Parish were private unless they destroyed the navigability of surrounding natural waterways, at which point they could no longer be privately controlled under state and federal law).

The undersigned agrees that the alleged dredging activities do not meet the first

14

condition of federal admiralty jurisdiction–the location condition. The alleged harmful acts all occurred on land. While some of the acts involved dredging and creating canals, the evidence indicates that these canals were private, special-use canals (for a specific oil and gas exploration and development), were not involved in "commerce," and thus not navigable. *See Henry J. Ellender Heirs, LLC v. Exxon Mobil Corp.*, 42 F.Supp.3d 812, 819 (E.D.La.,2014). Defendants point to maps which identify undisputed navigable water bodies (i.e. the Gulf of Mexico) located near the Operational Area; they have not established, however, that the canals at issue were connected to these navigable water bodies. Nor have they established that the canals were navigable because one could travel from the canal to one of the undisputed navigable bodies. The jurisprudence is clear that an artificial canal can constitute a navigable body of water, provided it is used as "a highway for commerce between ports and places in different states." *In re Katrina Canal Breaches Litigation*, 324 Fed.Appx. 370, 376 (5th Cir. 2009) (citing *In re Boyer*, 109 U.S. 629, 632 (1884)).

*2. Connection Test*

Even assuming *arguendo* that this case does meet the location test, it would still fail the connection test. Under the connection test, the first condition is that the general features of the type of incident involved must have a potentially disruptive impact on maritime commerce. As explained above, the court uses a description of

15

the incident at an intermediate level of possible generality, that is neither too broad to distinguish among cases nor too narrow to recognize potential effects on maritime commerce.

Although Defendants do not propose a precise description to apply to this analysis, in discussing the connection test, they contend that Plaintiffs' allege "Defendant's 'dredging activities have resulted in the degradation of terrestrial and aquatic life' and ... that the alleged activities have 'increased the risk of damage from storm-generated surges and other flooding damages, and has enabled and/or accelerated saltwater intrusion.' " *R. 70, p. 12.*

Defendants cite *In re Ingram Barge Co.*, 2007 WL 837181 (E.D.La.,2007), for the proposition that dredging "by its 'very nature ... seems to affect maritime commerce[.]' " *Id* at 6. Defendants reliance on *Ingram Barge* is misplaced. That case was a limitation proceeding brought by the owner of a barge that allegedly struck and destroyed a levee in the Mississippi River Gulf Outlet ("MRGO") during Hurricane Katrina. It was undisputed that the MRGO was a navigable waterway. The barge owner filed a third-party complaint against the United States contending, *inter alia*, that the government's negligent construction and dredging of the MRGO and related canals and levees caused the damage. In determining whether or not maritime law applied, the Court cited *Grubart* and found that the dredging of the MRGO "to keep

16

waterways passable for commercial and other vessels" appeared to show a substantial relationship to traditional maritime activity. Creation of a canal by dredging on private land, as in this case, is not analogous to the dredging of a commercial navigable water body in *Ingram Barge*.

The Court finds Defendants' description of the incident focusing only on the dredging allegation is too narrowly drawn and ignores that the Petition's allegations of oil and gas activities which focus primarily on the negligent construction and closure of waste pits and discharge of wastes. *R. 1-2, ¶¶ 20 - 24*. Further, Defendants' description is a statement of the harm rather than the particular circumstances of the incident. The Court finds that at an intermediate level of generality, the incident here is properly described as negligent/intentional construction activity during oil and gas exploration and development.

Having characterized the incident, the Court must evaluate whether the incident has a potentially disruptive impact on maritime commerce—that is, whether the incident could be seen within a class of incidents that pose more than a fanciful risk to commercial shipping. Coastal damage, by itself, does not interfere with maritime commerce or commercial shipping. *See Board of Com'rs of the Southeast Louisiana Flood Protection Authority-East v. Tennessee Gas Pipeline Co., LLC*, 29 F.Supp.3d 808, 826 (E.D.La.,2014). It does not impede vessel traffic, *see, e.g., Grubart*, 513

U.S. at 539 (noting that "river traffic ceased, several commuter ferries were stranded, and many barges could not enter the river system because the river level was lowered to aid repair efforts"), nor threaten the physical integrity of vessels, *see, e.g., Sisson v. Ruby*, 497 U.S. 358, 361 (1990)(recognizing that a fire "can spread to nearby commercial vessels or make the marina inaccessible to such vessels" and "is one of the most significant hazards facing commercial vessels").

While the Court concludes that the incident at issue does not have a potentially disruptive impact on maritime commerce, for completeness the Court will address the second prong of the connection test, that is whether oil and gas exploration and development shows a substantial relationship to traditional maritime activity. The Fifth Circuit, in *In Re Louisiana Crawfish Producers*, 772 F.3d 1026, 1030 (5th Cir. 2014), considered whether certain oil and gas activities—pipeline construction and repair—show a substantial relationship to traditional maritime activity. The court stated, "[t]he caselaw shows it does not." *Id.* (citing *Herb's Welding, Inc. v. Gray*, 470 U.S. 414 (1985) and *Hufnagel v. Omega Service Industries, Inc*., 182 F.3d 340, 351 (5th Cir. 1999)); *see also, Thibodeaux v. Grasso Production Management, Inc*., 370 F.3d 486, 493 (5th Cir.2004) ("[b]oth this court and the Supreme Court have expressed the opinion that work commonly performed on oil production platforms is not maritime in nature.").

18

Defendants cite *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico*, 808 F.Supp.2d 943, 951 (E.D.La.2011), for the proposition that the connection test can be met when the activities alleged involve oil and gas production. In that case, the court found that the connection test was met because the explosion caused a disruption of maritime commerce and the operations of the DEEPWATER HORIZON "bore a substantial relationship to traditional maritime activity." *Id.* (citing *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538–39 (5th Cir.1986) ("oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce")). Here, there was no oil and gas drilling on navigable waters aboard a vessel. Rather, the Court finds that *Henry J. Ellender Heirs, LLC v. Exxon Mobil Corp.*, 42 F.Supp.3d 812, 819 (E.D.La.,2014) is analogous to this case. There, the court found that the activity at issue took place on land and did not cause a disruption of maritime commerce like the one on the DEEPWATER HORIZON. Thus, just as the Court held in *Ellender*, *In re Oil Spill by the Oil Rig Deepwater Horizon* is not applicable and this Court does not have jurisdiction over this case pursuant to 28 U.S.C. § 1333.

Based on the foregoing, the Court finds that it does not have admiralty jurisdiction over this matter. Accordingly, the Court need not decide whether general maritime law claims are removable under 28 U.S.C. § 1441(b) absent a separate and

19

independent ground of federal subject matter jurisdiction.

### 2) *Outer Continental Shelf Lands Act Jurisdiction*

Defendants also argue that this Court has federal question jurisdiction pursuant

to the Outer Continental Shelf Lands Act ("OSCLA"). "The purpose of the [OCSLA]

was to define a body of law applicable to the seabed, the subsoil, and the fixed

structures ... on the outer Continental Shelf." *EP Operating Ltd. Partnership v. Placid*

*Oil Co.*, 26 F.3d 563, 569 (5th Cir.1994). Accordingly, 43 U.S.C. § 1333 provides

that the law to be applied to the OCS is exclusively federal, with the law of the

adjacent state being adopted as surrogate federal law to the extent such law is

applicable and not inconsistent with federal law. *Id.* at 566; 43 U.S.C. § 1333(a)(1).

Thus, the OCSLA contains its own independent grant of original jurisdiction:

> [T]he district courts of the United States shall have jurisdiction of cases
> and controversies arising out of, or in connection with (A) any operation
> conducted on the outer Continental Shelf which involves exploration,
> development, or production of the minerals, of the subsoil and seabed
> of the outer Continental Shelf, or which involves rights to such minerals,
> or (B) the cancellation, suspension, or termination of a lease or permit
> under this subchapter.

43 U.S.C. § 1349(b)(1).

The Fifth Circuit has recently explained that "[c]ourts typically assess

jurisdiction under this provision in terms of whether (1) the activities that caused the

injury constituted an 'operation' 'conducted on the outer continental shelf' that

20

involved the exploration and production of minerals, and 2) whether the case 'arises out of or in connection with' the operation." *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir.2014). The statute does not define the term "operation," but in this circuit, "operation" for purposes of OCSLA jurisdiction is defined as "the doing of some physical act." *Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*, 87 F.3d 150, 154 (5th Cir.1996). The term "operation" is broadly construed because it is used in conjunction with the terms "exploration," "development," and "production," all of which are broadly defined in OCSLA, and encompass the full range of oil and gas activity. *EP Operating Ltd. Partner. v. Placid Oil Co.*, 26 F.3d 563, 568 & n. 12 (5th Cir.1994).

Once it has been established that the activities that caused the injury constituted an operation on the Outer Continental Shelf ("OCS") and the first prong of the inquiry is met, courts in this circuit then apply a "but for" test to determine the causation aspect of the second prong—whether the dispute "arises out of, or in connection with" the OCS operation. *Tenn. Gas*, 87 F.3d at 155. In applying this test, the court asks whether the injury would have occurred in the absence of the OCS operation identified in the first prong. *See id.* The Fifth Circuit has interpreted § 1349(b)(1) as straightforward and broad. *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). A plaintiff need not expressly invoke OCSLA for it to apply. *Id.*

It is undisputed that all of the alleged oil and gas exploration and production

activities that give rise to the claims asserted in this action occurred in Vermilion Parish—none of the operations that gave rise to the alleged violations of the CZM Laws occurred on the OCS. All of the resulting injury and damage was sustained in Vermilion Parish, not on the OCS. Nonetheless, Defendants argue that OCSLA vests this Court with original subject matter jurisdiction because OCSLA's jurisdictional grant does not contain a situs requirement, and the complained of activities need not have occurred on the OCS in order for jurisdiction to attach. Defendants assert that the Fifth Circuit has upheld OCSLA jurisdiction where the dispute did not involve any physical acts on the OCS.

Defendants contend that some of the complained of activities underlying Plaintiffs' action are part of operations on the OCS that involve the development and production and transmission of oil and gas.[6] They further contend that some of the alleged permit violations cover pipelines that transport oil and gas. These pipelines originate on the OCS, cross the federal-state water boundary, and enter the Operational Area. Because these activities constitute an essential component of "operations" on the OCS, Defendants maintain this Court has jurisdiction over Plaintiffs' claims which arise from these operations under OCSLA's broad

---

[6] In their Notice of Removal, Defendants' stated, "[t]he challenged activities involve components of the dense, highly integrated, and interconnected infrastructure relating to the Outer Continental Shelf." *R. 1.*

jurisdictional grant. Defendants also assert that this lawsuit presents a threat to federal interests because the relief sought in the Petition suggests that Plaintiffs are seeking to remove Defendants' infrastructure supporting the oil and gas operations in the Operational Area. Defendants assert that this would have an adverse impact on oil and gas production on the OCS because the OCS and onshore oil and gas systems overlap and share infrastructure. Finally, Defendants assert that the injuries alleged in this case would not have occurred "but for" OCS operations, satisfying the "but for" test for OCSLA jurisdiction.

After reviewing the Petition, the Court is unable to locate any claims specifically related to "pipeline(s)," much less any operations on the OCS.[7] While Plaintiffs cannot simply disavow OSCLA jurisdiction, the Petition specifically states, "Plaintiffs do not allege that any acts, omissions, operations or activities occurring on the Outer Continental Shelf violated any CZM Laws. None of the acts, omissions, operations or activities that form the basis of Plaintiffs' claims in this petition involve operations or activities on the Outer Continental Shelf." *R. 1-2, ¶ 33(o).*

In their opposition, Plaintiffs assert that § 1349(b)(1) supports jurisdiction only when a complaint is based on an "*operation conducted on the outer Continental*

---

[7] The Court notes that Exhibit D of the First Amended Petition, *R. 1-2,* lists "Coastal Use Permits for Work in the Operational Area" and includes several pipeline permits. *See e.g.* P19950080, *Unocal Pipeline Co.,* 12" pipeline.

*Shelf.*" In support they argue that the Fifth Circuit "has defined 'operation' to be 'the doing of some physical act,'" *Barker v. Hercules Offshore, Inc*., 713 F.3d 208 (5th Cir. 2013) ("[T]his Court has explained that the term "refers to the doing of some physical act."), and that *In re Deepwater Horizon*, expressly limits the term "operation" in § 1349(b)(1) to "activities that caused the injury." 745 F.3d at163. They further assert that a case or controversy that "arises out of, or in connection with" a non-OCS operation is not within the grant of § 1349(b)(1) jurisdiction.

The Court turns to the first prong of the Fifth Circuit's OCSLA jurisdiction analysis—whether the activities that caused the injury constituted an operation conducted on the OCS. The activities or operations that Plaintiffs allege to have caused injury all occurred in state waters where Defendants' activities were subject to Louisiana's permitting scheme. While Plaintiffs' Petition makes no specific allegation related to pipelines, Defendants contend that some on-land activities involved pipelines that ultimately stretched to the OCS. However, **none** of the activities, including those that involved such pipelines, took place on the OCS. Defendants cannot dispute that § 1349(b)(1) expressly ties OCSLA jurisdiction to an operation on the OCS. Defendants have not cited, and the Court is not aware of any Fifth Circuit case such as this one—involving damage resulting from injurious physical acts exclusively on land— that has eliminated that requirement.

Defendants encourage the Court to apply the reasoning used in Fifth Circuit cases such as *EP Operating Ltd. Partner. v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir.1994) and *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1207 (5th Cir.1988). Defendants contend these decisions demonstrate that OCSLA jurisdiction is appropriate even when no physical acts occur on the OCS. Relying on these cases, Defendants argue that jurisdiction is proper because this action "involves" operations on the OCS, and it therefore arises in connection with OCS operations. In support of this argument, Defendants submit the affidavit of Benjamin Schlesinger, Ph.D. *R. 70-5*.

Initially, Schlesinger, an energy consultant for the natural gas and energy industries, explains in his affidavit why the OCS and onshore oil and gas systems in Louisiana do not operate independently, and how interfering with or removing certain aspects of the onshore infrastructure will risk disrupting OCS operations and possibly the delivery of federal royalties. *Id. at ¶¶ 12, 12a, 24*. Schlesinger concludes that any interruption of or removal of permitted facilities would place OCS operations at substantial risk by disrupting or preventing transportation of OCS products to market. *Id. ¶ 26*. Schlesinger also prepared a visual depiction of how some of the permits in this action involve pipelines that pass through the Operational Area to carry oil and gas from the OCS. In particular, Permits P19950080 and P20061360 originate on the

25

OCS and services production on the OCS. *Id. ¶ 15; Exhibits C & E.*

Defendants correctly state that *EP Operating* and *Amoco Production* uphold OCSLA jurisdiction in the absence of physical acts on the OCS. The distinction between those cases and a case such as this one, however, is that the causes of action in those cases did not arise out of any type of physical act whatsoever, much less an injurious one. *EP Operating* was a property partition action, and *Amoco Production* was a contract dispute. Each of those commercial litigation cases involved equipment and production located on the OCS and the cause of action directly pertained to that equipment and/or production. *EP Operating*, 26 F.3d at 569 (millions of dollars worth of offshore equipment attached to the seabed of the OCS); *Amoco Production*, 844 F.2d at 1207 (take or pay contracts specifically pertaining to offshore production). The Fifth Circuit's challenge in those specific cases was to adhere to § 1349's requirement of an "operation" on the OCS in cases where the nature of the cause of action involved no physical act giving rise to the claim. Thus, while these cases clearly support the proposition that OCSLA jurisdiction does not require a substantive cause of action that arises out of a physical act on the shelf, it does not follow that OCSLA jurisdiction attaches in a case where the cause of action is based on injurious physical acts and those injurious acts occur in state waters. In other words, Defendants are urging the Court to ignore the usual two-prong test that applies when

the case involves injurious physical acts and apply a test that the Fifth Circuit has never held applicable in an injury case, property or otherwise.

Defendants next cite *Ronquille v. Aninoil, Inc*., 2014 WL 4387337 (E.D.La. Sept. 4, 2014) to support their argument that OCSLA jurisdiction attaches even where both the injury-causing activity and the injuries themselves occurred on land. Defendants' reliance on *Ronquille* does not change this result. In *Ronquille*, the plaintiff alleged that he had been exposed to asbestos through his work, which "included the unloading and loading of barges, other boats, and trucks that transported equipment and pipe from OCS platforms." The *Ronquille* court determined that this activity constituted direct support for rigs on the OCS, and thus provided a "sufficient connection to the operations on the OCS." This finding, however, goes to the second element of the OCSLA jurisdictional test; in *Ronquille*, there was never a question as to whether the facts satisfied the operational prong.[8] In

---

[8] *Ronquille* is in line with other Fifth Circuit precedent where the court found OCSLA jurisdiction when an OCS worker suffered an injury off of an OCS fixed platform. *See Hufnagel v. Omega Serv. Indus. Inc.*, 182 F.3d 340 (5th Cir.1999) (OCSLA jurisdiction when a platform worker was housed on an adjoining vessel and injured while working on the platform and performing certain maintenance or repair operations); *Recar v. CNG Producing Co.*, 853 F.2d 367 (5th Cir.1988) (holding OCSLA applicable to a personal injury suit brought by platform worker when a rope from which he was swinging broke and caused him to fall onto an adjacent vessel); *Barger v. Petroleum Helicopters, Inc.*, 692 F.2d 337 (5th Cir.1982) (applying OCSLA when a helicopter pilot crashed on the OCS while ferrying employees to production platforms). The Fifth Circuit in these cases also focused its analysis on the second OCSLA element, the "but for" test, as all of the injuries stemmed from fixed platforms on the OCS and therefore clearly satisfied the first OCSLA element.

27

this case, on the other hand, Defendants have not demonstrated that the first element of the OCSLA test is met. The Court finds, based on the foregoing, that it does not have jurisdiction over this case pursuant to OCSLA.

Defendants seek to attach OSCLA based on speculation that Plaintiffs' plea for reparation of damages to the natural environment caused by oil and gas exploration and production related activities necessarily includes the threat of shutting down or altering the delivery of OCS oil and gas to onshore facilities. In an effort to refute Defendants' speculative theory of jurisdiction, Plaintiff include in their reply, the affidavit of Sherwood M. Gagliano, Ph.D, a geologist and physical geographer at LSU and President of Coastal Environments, Inc. *R. 88-2.* Dr. Gagliano states that "restoring marsh, beach and marine habitats, damaged through time by an OCS pipeline, would follow the same measure utilized by the Coastal Protection and Restoration Authority for a typical project." *R. Id, ¶ 18*. He further states that "coastal restoration can and often does complement OCS production....  restoration projects have been designed and implemented across the coast without interruption of OCS production" *Id at ¶ 19*.

As to Defendants' argument that the interconnectedness and interdependence of operations on the OCS with the oil and gas infrastructure located in the Operation Area creates OCSLA jurisdiction, Plaintiffs assert that this Court should apply the

28

analyses of the courts in the Eastern District of Louisiana which addressed this very issue. *R. 42, Exh. B, EDLA cases*. The Court agrees. All of the EDLA courts rejected virtually identical arguments that interconnectedness of the coastal zone and OCS activities implicates OCSLA jurisdiction. Noting agreement among all courts, the court in *Parish of Plaquemines v. Total Petrochemical & Refining USA, Inc.*, 64 F.Supp.3d 872 (E.D.La.,2014), stated,

> [T]he relationship between the injuries in this case and the activities that cause them and any operations on the OCS is simply too remote and attenuated. Exercising jurisdiction in this manner would give federal courts jurisdiction over virtually any oil or gas dispute regardless of its relationship to OCS operations.
>
> • • •
>
> In sum, because Defendants cannot establish that the activities that caused the injury constituted an operation "conducted on the outer continental shelf," jurisdiction fails without consideration of the Fifth Circuit's "but for" test. The Court does not decide that OCSLA jurisdiction can never attach when the injury causing acts and the damage are sustained off the shelf, if the connection to offshore operations is strong enough. *See, e.g., Ronquille v. Aminoil Inc., supra*. But in this case the "mere connection" between the claims asserted and an OCS operation is "too remote" to establish federal jurisdiction. *Deepwater Horizon*, 745 F.3d at 163.

*Id* at 898.

In sum, Defendants' argument that the permits invoke OCSLA jurisdiction because the regulated pipeline connects to the OCS is without merit. To subscribe to the argument that OCSLA jurisdiction is triggered by any claim concerning a pipe

29

that transports minerals originating from the OCS would open the floodgates to cases that could invoke OCSLA jurisdiction far beyond its intended purpose. It is therefore evident that this Court cannot exercise federal jurisdiction over these claims pursuant to OCSLA.

### 3. Substantial Federal Question

Defendants, Apache and LLOG (collectively referred to as "Apache"), assert there is federal question jurisdiction under the laws of the United States for the purposes of 28 U.S.C. § 1331 because Plaintiffs' requested remedy, coastal restoration, implicates the authority of the U.S. Army Corps of Engineers (the "Corps"). *R. 68*.

Plaintiffs state claims in this action solely under the "CZM Act of 1978", La. R.S. 214.21, *et seq.* Thus, state law creates Plaintiffs' causes of action for violations of state permits. In *Gunn v. Minton*, 133 S.Ct. 1059 (2013), the Supreme Court noted that "a case can arise under federal law in two ways. Most directly, a case arises under federal law when federal law creates the cause of action asserted.... this creation test admits of only extremely rare exceptions ... and accounts for the vast bulk of suits that arise under federal law." *Id* at 1064.

"But even where a claim finds its origins in state rather than federal law," the Supreme Court has "identified a special and small category of cases in which arising

under jurisdiction still lies." *Id*.  In that small category, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id*. at 1065. All four requirements must be met for a state-law claim to arise under federal law. *See id*. This "doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg*., 545 U.S. 308, 312 (2005). The Supreme Court has not "treated 'federal issue' as a password opening federal courts to any state action embracing a point of federal law." *Id*. at 314.

Apache  contends there exist questions of federal law in this case which are "necessarily raised by" and are "central to" Plaintiffs' lawsuit—"questions concerning the scope of the Corps' authority to assert ultimate control over operations in the Coastal Zone and whether that authority is exclusive, as well as questions concerning the effect of federal law on the permitted scope and authority of the state standards." *R. 68 at p. 17.* Apache contends that the Corps has "federal authority" over the remedy sought by Plaintiffs which derives from the Rivers and Harbors Act

31

of 1890 ("RHA")[9] and the Clean Water Act ("CWA").[10]  Apache concedes that the state of Louisiana and Vermilion Parish "have an interest in the management and protection of the Coastal Zone." They contend, however, that any attempt to perform restoration ordered by the State Court without the Corps' approval would violate statutory and regulatory provisions.

While Apache minimizes Plaintiffs' citation to the 2013 article in the Ecology Law Quarterly, *Reverse Preemption*, written by UCLA Professor of Environmental Law, Ann E. Carlson and Andrew Mayer,[11] it cannot deny the significance of the Coastal Zone Management Act's grant of power and concurrent authority to the states. Apache's argument, however, points only to the federal statutes and regulations that apply to the Corps and ignores the provisions of the Coastal Zone Management Act as well as the state's control over its sovereign lands pursuant to the public trust doctrine.

The Coastal Zone Management Act, 16 U.S.C. § 1451 et seq. ("CZMA"), was

---

[9] The Rivers and Harbors Act of 1890 restricted construction of bridges, piers, and abutments on navigable streams. *Georgia Power Co. v. Sanders*, 617 F.2d 1112, 1127 (5th Cir. 1980).

[10] The Clean Water Act prohibits "the discharge of any pollutant" without a permit into "navigable waters," which it defines, in turn, as "the waters of the United States." 33 U.S.C. §§ 1311(a), 1362 (7), (12).

[11] Carlson and Meyer, *Reverse Preemption*, 40 Ecology L.Q. 583, 595 (2013).

enacted by Congress in 1972 in an attempt to respond to increasing and competing demands on the nation's coastal resources. *See* 16 U.S.C. § 1451. Among other things, it was intended to encourage states to develop Coastal Management Programs ("CMPs") that set standards for public and private uses of land and water coastal zone. *Id*. § 1453(12). Under the CZMA, applicants for certain federal licenses or permits for activities affecting coastal resources may be required to certify that the proposed activity complies with the affected state's federally approved CMP and that such activity will be conducted in a manner consistent with the CMP. *See* 16 U.S.C. § 1456(c)(3)(A). This process is known as "consistency certification." *See* 15 C.F.R. § 930.57.

In exchange for their participation, states also receive an assurance that any federally permitted or licensed activity will comply with the CMP. *Id*. § 1456(c). When an applicant seeks a federal license or permit for an activity listed in the state's approved CMP, the applicant must certify that the activity "complies with the enforceable policies of the state's [CMP] and that such activity will be conducted in a manner consistent with the program." 16 U.S.C. § 1456(c)(3)(A). "A State must include in its management program submission ... [a] list of Federal license and permit activities that will be subject to review."  15 C.F.R. § 923.53(a)(2); § 930.53(a). Listed activities must be described in the CMP in terms of the specific

federal license or permit involved, e.g. "Corps of Engineers 404 permits, Coast Guard bridge permits." 15 C.F.R. § 930.53(a). The CZMA gives states a conditional veto over federally licensed or permitted projects that are not consistent with "the enforceable policies of the state's approved [CMP]," subject to a final override by the Secretary. 16 U.S.C. § 1456(c)(3)(A); *see also California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 590-91 (1987) (generally describing consistency review process).

In addition to the foregoing, Apache's claims also implicate the common law Public Trust Doctrine and its state statutory expression. In *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469 (1988), the Supreme Court confirmed that the Public Trust doctrine provides that submerged and submersible lands are preserved for public use in navigation, fishing, or recreation, and the state, as trustee, bears the responsibility and possesses the authority to preserve and to protect the use of the waters for those purposes." The traditional principles of the public trust doctrine postulate that all tidelands and lands under navigable water were owned by the original thirteen states, as successors in sovereignty under the common law of royal ownership, and that the states own these lands subject to a public trust for the benefit of all their citizens with respect to certain rights of usage, particularly uses related to maritime commerce, navigation, and fishing. *Id.* at 476 - 478.

34

"It is the well settled law of this country that a state holds title to land under navigable waters within its limits and that the title is held in trust for the people of the state that they may enjoy and use the waters free from obstruction or interference. A public trust for the protection, conservation and replenishment of all natural resources of the state was recognized by art. VI § 1 of the 1921 Louisiana Constitution. The public trust doctrine was continued by the 1974 Louisiana Constitution, which specifically lists air and water as natural resources, commands protection, conservation and replenishment of them insofar as possible and consistent with health, safety and welfare of the people, and mandates the legislature to enact laws to implement this policy. La. Const. art. IX § 1; Cf. Id. art. IX § 3." *Save Ourselves, Inc. v. Louisiana Environmental Control Com'n*, 452 So.2d 1152, 1154 (La.,1984). The ultimate issue in this case—coastal restoration—fits precisely within the public trust doctrine. *See Avenal v. State*, 886 So.2d 1085, 1101-1102 (La.,2004).

As to Apache's argument that the federal issue in this case is the scope of the Corps' authority to assert ultimate control over operations in the Coastal Zone, the "federal issue" expressed by Apache lacks the definite character of the specific and narrow questions of federal law which the Supreme Court has held satisfy the first two requirements of a federal issue "necessarily raised" and "actually disputed." In the most recent example, *Gunn v. Minton*, the Court held that a state-law malpractice

35

claim necessarily required application of federal patent law to decide whether the outcome of an earlier patent case would have been different had an attorney raised a particular argument. *See* 133 S.Ct. at 1065. The  Court found that the state-law claim met the first two *Grable* requirements because the patent law issue was "necessarily raised" and "actually disputed." *See id* . at 1065. The Court found, however, that the last two *Grable* requirements were lacking because the federal issue was "not substantial in the relevant sense" to "the federal system as a whole," *see id.* at 1066, and because having the case heard in state court did not disrupt "the appropriate 'balance of federal and state judicial responsibilities,' " *see id.* at 1068. Prior to *Gunn*, in *Grable & Sons*, the Court held that a state-law action to quiet title as to property sold at a federal tax sale necessarily required interpretation of a federal statute governing notice of that sale. *See* 545 U.S. at 314–15 ("Whether Grable was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case.").

The recent case, *Board of Commissioners*, (*Levee Board*), is also distinguishable. There, the plaintiff agency brought state-law tort claims and based the standard of care on federal law, which would require the court to decide "what duties these laws impose on Defendants." *Id,* 29 F.Supp.3d at 854. The court held that

36

"[i]n determining whether Plaintiff may prevail on its claim for negligence, the Court will have to interpret federal law to ascertain, among other issues," compliance with duties imposed by federal law. *Id* at 854-855. In particular, the court found that the Levee Board's (1) claims of negligence and public nuisance necessarily required a duty under federal statutes; (2) petition drew on federal laws as the exclusive basis for holding defendants liable; and (3) third party beneficiary claim was based on a contract to which the United States was a party.  *Id* at 854-856.

In this case, Plaintiffs' state court petition does not argue that federal regulations and statutes establish the duties owed by Defendants.[12] Rather, Plaintiffs' petition alleges that Defendants breached duties imposed under Louisiana law only. Because the plaintiff in *Board of Commissioners* argued that the federal standards established the duties owed by defendants, and the defendants did not have an independent duty under Louisiana law, the Court determined that the federal statutes were not just one of multiple theories that could support the plaintiff's negligence and nuisance claim. *Id at* 854. Here, Plaintiffs' state court petition explicitly references only the Louisiana statutes, civil code articles, and local ordinances that Plaintiffs allege Defendants have violated. *R. 1-2*. Further, Defendants have not argued that

---

[12]  Apache has raised the issue of federal standards as a defense. However, "[a] defense that raises a federal question is insufficient" to provide jurisdiction. *See MSOF Corp v. Exxon Corp*., 295 F.3d 485, 490 (5th Cir. 2002).

they have no independent duty under Louisiana law. Whereas the Court in *Board of Commissioners* concluded that the defendants did not have an independent duty under Louisiana law, Defendants in this case may owe a duty to Plaintiffs under the Louisiana Civil Code.[13]    See *Id.* at 854 (citing *Barasich v. Columbia Gulf Transmission Co.*, 467 F.Supp.2d 676, 693 (2006)(plaintiffs complained that the defendants' activities had caused damage to plaintiffs' own property). Unlike *Board of Commissioners*, Plaintiffs state-law claims do not raise a federal issue.

Apache does not articulate a remotely comparable specific federal issue in this case with any meaningful degree of specificity. Accordingly, the Court concludes that Apache has not carried its burden, as the proponent of jurisdiction, to establish that Plaintiffs' claims fall into the "special and small category" of cases in which Plaintiffs' specifically expressed state-law claims nonetheless arise under federal law. The Court lacks federal-question jurisdiction.

*4. Immunity Under the Eleventh Amendment*

In light of this Court's finding that there is no subject matter jurisdiction for removal in this case, the Court need not address the Defendants' opposition to the

---

[13] Louisiana law provides that a person may be responsible because he has violated certain rules of property law or obligations imposed upon him as owner or user of property. A.N. Yiannopolous, Predial Servitudes, in 4 Louisiana Civil Law Treatise § 3:10 (4th ed.). *See e.g.,* Civil code articles 667, 668, 669, 2315.

State of Louisiana's[14] argument, *R. 67*, that its sovereign immunity under the Eleventh Amendment prohibits Defendants from removing this case to federal court.

## *IV. Conclusion*

Based on the foregoing, it is recommended that the Plaintiffs' Motions to Remand [Rec. Docs. 46, 50, 51] be GRANTED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415

---

[14] The State of Louisiana Plaintiffs include *ex rel.* Jeff Landry, Attorney General and Intervenor-Plaintiff, the State of Louisiana, through the Louisiana Department of Natural Resources, Office of Coastal Management and its Secretary, Thomas F. Harris

(5th  Cir.1996).

Signed at Lafayette, Louisiana, on this 30th day of June, 2017.


_____
**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**

40